IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

No. 4:10-CV-00178-FL

| | |
|---|---|
| JOSEPH CARNELL SPRUILL, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>)<br>MICHAEL J. ASTRUE, )<br>Commissioner of Social )<br>Security, )<br>)<br>Defendant. )<br>_____ ) | **MEMORANDUM &<br>RECOMMENDATION** |

This matter is before the Court upon Plaintiff's motion for judgment on the pleadings (DE-28) and Defendant's motion for judgment on the pleadings (DE-31). The time for the parties to file any further responses or replies has expired. Accordingly, the matter is now ripe for adjudication. Pursuant to 28 U.S.C. § 636(b)(1), this matter has been referred to the undersigned for the entry of a memorandum and recommendation. For the following reasons, it is RECOMMENDED that Plaintiff's motion for judgment on the pleadings (DE-28) be DENIED, that Defendant's motion for judgment on the pleadings (DE-31) be GRANTED, and that the final decision by Defendant be AFFIRMED.

I. **STATEMENT OF THE CASE**

Plaintiff applied for disability insurance benefits ("DIB") and supplemental security income benefits ("SSI") on August 8, 2007, alleging that he became unable to work on August 8, 2004. (T.pp.9, 24, 96, 100). His application was denied initially and upon reconsideration.

1

(T.pp.9, 41, 48). An Administrative Law Judge ("ALJ") held a video hearing on the matter February 1, 2010, during which a vocational expert ("VE") testified. (T.pp.21-36). In a decision dated March 2, 2010, the ALJ determined Plaintiff was not disabled during the relevant time period. (T.pp.9-20). The Social Security Administration's Office of Disability Adjudication and Review ("Appeals Council") denied Plaintiff's request for review on October 15, 2010, rendering the ALJ's determination as Defendant's final decision. (T.p.4). Plaintiff filed the instant action on December 8, 2010. (DE-3).

## II. DISCUSSION

### A. Standard of Review

This Court is authorized to review Defendant's denial of benefits under 42 U.S.C. § 405(g), which provides in pertinent part:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive.

"Under the Social Security Act, [the court] must uphold the factual findings of the Secretary if they are supported by substantial evidence and were reached through application of the correct legal standard." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996). "Substantial evidence is . . . such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its]

2

judgment for that of the Secretary." Craig, 76 F.3d at 589. Thus, this Court's review is limited to determining whether Defendant's finding that Plaintiff was not disabled is "supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir.1990).

The Social Security Administration has promulgated the following regulations establishing a sequential evaluation process to determine whether a claimant is entitled to disability benefits:

> The five step analysis begins with the question of whether the claimant engaged in substantial gainful employment. 20 C.F.R. § 404.1520(b). If not, the analysis continues to determine whether, based upon the medical evidence, the claimant has a severe impairment. 20 C.F.R. § 404.1520(c). If the claimed impairment is sufficiently severe, the third step considers whether the claimant has an impairment that equals or exceeds in severity one or more of the impairments listed in Appendix I of the regulations. 20 C.F.R. § 404.1520(d); 20 C.F.R. Part 404, subpart P, App.I. If so the claimant is disabled. If not, the next inquiry considers if the impairment prevents the claimant from returning to past work. 20 C.F.R. § 404.1520(e); 20 C.F.R. § 404.1545(a). If the answer is in the affirmative, the final consideration looks to whether the impairment precludes the claimant from performing other work. 20 C.F.R. § 404.1520(f).

Mastro v. Apfel, 270 F.3d 171, 177 (4th Cir. 2001).

**B. ALJ's Findings**

In the instant action, the ALJ employed the sequential evaluation. First, the ALJ found that Plaintiff is no longer engaged in substantial gainful employment. (T.p.11). At step two, the ALJ found that Plaintiff suffered from the following severe impairments: (1) cervical degenerative disc disease; (2) lumbar degenerative disc disease; and (3) bilateral osteoarthritis of the knees. (T.p.11). However, the ALJ determined that these impairments or combination of impairments were not severe enough to meet or medically equal one of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1. (T.p.11). Based on the record as a whole, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform a significant

3

range of sedentary, unskilled work. (T.p.12). However, the ALJ noted that Plaintiff would have to use a cane at all times to ambulate within the workplace. (T.p.12).

The ALJ then proceeded with step four of his analysis and determined that Plaintiff was unable to perform his past relevant work. (T.p.18). However, relying upon the testimony of the VE and information contained in the *Dictionary of Occupational Titles* ("DOT"), the ALJ found that Plaintiff was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (T.p.19). Based on these findings, the ALJ determined that Plaintiff was not under a disability at any time through the date of his decision. (T.p.19). The ALJ's findings were based upon the following substantial evidence in the record.

### C. Plaintiff's Testimony and Other Evidence of Record

Plaintiff was forty-three years old at the time of the alleged onset of his disability. (T.p.24). Plaintiff testified he is single, lives alone, and has no children. (T.p.25). After Plaintiff graduated high school, he served as a submariner in the United States Navy from 1989 until 1992, when he was honorably discharged. (T.pp.25-26). Plaintiff has not worked since August 2004. (T.p.26). He lives in Section 8 subsidized housing and receives $354 monthly in military disability benefits from the Veteran's Administration ("VA"), which rates Plaintiff's lumbosacral strain as a thirty percent disability. (T.p.26). After leaving the Navy, Plaintiff worked as a sales clerk, first at Wal-Mart, and later in the electronics department at Sears. (T.p.27). He stopped working at Sears when his "condition started to become aggravated, and [he] couldn't stand, and lift as much as [he] had been able to before." (T.p.27). Plaintiff reported having constant pain and stiffness in his neck and back, as well as numbness and tingling in his left arm. (T.p.28). The numbness extends from his fingers into his upper arm, and sometimes his hands cramp and he is unable to grip or grasp with them. (T.p.28). He occasionally wears a neck

4

brace. Plaintiff described his back pain as "a numbness [that] . . . turns into a sharp pain" with prolonged sitting or standing, requiring use of a back brace. (T.p.28). Plaintiff was first prescribed a back brace in February of 2008. (T.p.29). He wears the brace during the daytime whenever he is "doing any type of activity." (*Id.*). He also takes two prescribed medications for his pain. Plaintiff noted that surgical intervention for his back "would probably be [his] last resort" because he was "afraid of surgery." (T.p.29). Plaintiff also has knee pain that "flares up at times." (T.p.29). He wears a knee brace and uses a cane that was assigned to him by the VA office in 1998.

According to Plaintiff, he can only stand for approximately fifteen minutes before he must sit down and rest. (T.p.30). He can sit or walk for about fifteen or twenty minutes at a time. Plaintiff stated he cannot bend, stoop, or squat because it is "just too hard." (T.p.30). The pain sometimes affects his ability to concentrate and focus. Plaintiff's mother, who lives about twenty or thirty minutes away, often cooks for him and generally "helps out quite a bit." (T.p.31). Plaintiff spends most days lying down watching television and listening to music. (*Id.*). He has undergone sleep therapy at the VA to address chronic nightmares that "keep[] [him] from getting proper rest." (T.p.32). On a scale from one to ten, with one "being no pain, and 10 being pain so extreme you immediately go to the emergency room," Plaintiff described his average daily pain level as "eight to nine." (T.p.32).

An independent vocational expert, John M. Head, testified that an individual with Plaintiff's background and limitations could perform "[a] very limited range of the sedentary exertional level of work based on his use of the cane." (T.p.34). Utilizing the DOT, Mr. Head identified the occupation of "574.685-010, courier, brake lining" as one Plaintiff could perform. Mr. Head testified this position existed in the national and regional economy. (T.p.34).

Specifically, there were approximately 3,259 courier positions in the national economy and 690 courier positions in the regional economy. (*Id.*). Upon cross-examination, Mr. Head testified that "it would seem very improbable" that an individual who needed to alternate between sitting and standing every thirty minutes while using a cane could perform the position. (T.p.36).

Plaintiff also introduced medical evidence in support of his claim, summarized in pertinent part as follows:

Plaintiff receives his primary medical care at the VA Medical Center ("VAMC") in Durham, North Carolina. On February 24, 2003, Plaintiff visited the VAMC complaining of aching pain in his left knee that had reportedly lasted for two months. (T.p.253). An examination of his knee showed mild effusion, no warmth or tenderness, no instability, no decrease in range of motion, and crepitus with passive movement. (*Id.*). The attending physician suspected degenerative joint disease in Plaintiff's left knee and ordered x-rays. Meanwhile, the physician prescribed Tylenol, glucosamine, rest, and ice. (*Id.*).

Plaintiff sought treatment with an acute care facility on April 28, 2003 for pain and effusion in his right knee. (T.p.249). The attending physician drained the fluid from the knee and administered a steroid injection. At a follow-up visit at the VAMC on July 18, 2003, Plaintiff indicated that he was feeling well with the exception of his knee pain and "[i]n fact, [was] taking no medications at all." (*Id.*). The treatment note diagnosed Plaintiff with osteoarthritis in both knees.

On September 9, 2003, Plaintiff received a knee injection at the VAMC. (T.p.245). Pliantiff's right knee had moderate effusion but was not hot or tender. (*Id.*). Following the injection, Plaintiff was "ambulating well." (*Id.*). At a follow-up visit on February 11, 2004, Plaintiff reported that "overall, he [had] been feeling well" and that his back and knee pain was

6

Case 4:10-cv-00178-FL   Document 33   Filed 10/13/11   Page 6 of 18

"for the most part well treated with Motrin." (T.p.220). Plaintiff believed his back pain had given him "an altered gait," which in turn "further exacerbated his knee pain." (*Id.*). However, he felt his pain was "fairly well treated with Ibuprofen." (*Id.*). A physical examination revealed good movement in all four extremities and no cyanosis, clubbing, or edema. (T.p.221). Although Plaintiff complained of stiffness and demonstrated a slightly decreased range of motion when he arose from the exam table, he otherwise appeared to "ambulate[] with a smooth, steady gait." *Id.* The nurse prescribed Motrin for Plaintiff's back pain and osteoarthritis.

On January 17, 2006, Belk Troutman, M.D., diagnosed Plaintiff with cervical and lumbar strain. (T.p.192). Plaintiff informed Dr. Troutman that he also suffered from osteoarthritis in both knees, causing him constant pain and limiting his ability to bend. (*Id.*). Plaintiff described his cervical and lumbar strain as a "crushing, aching, squeezing, oppressing, burning, and sharp" pain, which he rated ten on a scale from one to ten. (T.p.192–93). Plaintiff stated that he required complete bed rest to relieve the pain. Upon examination, Dr. Troutman found Plaintiff's posture within normal limits and his gait antalgic on the right. (T.p.193). His range of motion short of pain was ninety degrees in both knees. (T.p.193–94). Dr. Troutman found no subluxation, locking pain, joint effusion, or crepitus in either of Plaintiff's knees. (T.p.193). However, Plaintiff suffered from fatigue, weakness, and lack of endurance in his knees, and repetitious use, such as walking or weight bearing, increased his knee pain. (T.p.194). Dr. Troutman's examination of Plaintiff's cervical spine revealed "marked tenderness of the paravertebral muscles in the midline over the neck." (*Id.*). Dr. Troutman found no ankylosis and "no evidence of intervertebral disc syndrome or nerve root compression of the cervical spine." (*Id.*). Dr. Troutman's examination of Plaintiff's thoracolumbar spine revealed no radiation of pain on movement but "tenderness over the lower spine in the thoracolumbar area at the midline."

7

(T.p.195). Diagnostic testing showed "[m]odern discogenic and osteoarthritic change of the cervical spine at levels C3 through C7" as well as "[c]hanges in the medullary portion of the distal femur and primal tibia consistent with old bone infarction" but otherwise a normal study of the right knee; and "[f]indings consistent with old mild bone infarction involving the distal left femur and proximal left tibia" in the left knee. (T.p.196). The lumbrosacral spine was within normal limits. (*Id.*). Dr. Troutman diagnosed Plaintiff with degenerative disc disease and degenerative joint disease of the cervical spine at C3 through C7 and a lumbar strain. (T.pp.196–97). In addition, Dr. Troutman wrote that, "[f]or the claimed condition of osteoarthritis of bilateral knees, there is no diagnosis on the basis of physical examination, but . . . the x-ray diagnosis is status post old bone infarction of the distal femur and proximal tibia bilaterally." (T.p.196). Dr. Troutman also remarked "that although [Plaintiff] alleges severe pain in all of his joints that are involved – the knees, the cervical and lumbar spine, the examination does not reveal anything of the severity that he complains of." (T.p.197). Similarly, Dr. Troutman opined that, while Plaintiff experienced mild to moderate difficulty in performing tasks that involved turning his head or working overhead, Plaintiff had no "significant problems that would affect his daily activity or occupation." (*Id.*).

A second examination was performed on June 11, 2007, by Marcelo R. Perez-Montes, M.D., M.P.H., who diagnosed Plaintiff with lumbar and cervical strain. (T.p.184). Plaintiff reported constant localized lower back pain, as well as stiffness, weakness, and constant, localized pain at the base of his neck. Plaintiff characterized his pain as aching, burning, sharp, and extremely severe: "9/10 at the highest level." (*Id.*). However, Plaintiff told Dr. Peres-Montes that the pain was "relieved by rest, by itself, or with ibuprofen." (*Id.*). Plaintiff "denie[d] any incapacitation or functional impairment as a result of [his] condition[s]," and Dr. Perez-Montes

8

opined that Plaintiff could function with medication. (*Id.*). While Dr. Perez-Montes characterized Plaintiff's gait as "abnormal" because he walked with "slow and guarded steps," Plaintiff displayed no limp or "instability of gait." (T.p.185). Dr. Perez-Montes' impression of the lumbrosacral spine was "[m]oderate discogenic and osteoarthritic change . . . at L5-S1," and his impression of the cervical spine was "[m]arked osteoarthritic change . . . at level C3 through C7." (T.p.186). Dr. Perez-Montes wrote that Plaintiff's lumbar strain had progressed to degenerative disc disease and degenerative joint disease at L5-S1, and that his cervical strain had progressed to degenerative joint disease at C3 through C7. (T.p.187).

E.C. Land, M.D. examined Plaintiff on December 18, 2007 for purposes of a disability determination. (T.p.321). Plaintiff complained to Dr. Land of diffuse, sharp, and constant back pain. (*Id.*). Dr. Land noted that Plaintiff's back pain did not radiate and was reportedly localized to an area extending from the lower cervical spine to the lumbar spine. Plaintiff could not describe any activity that specifically worsened his pain. He also reported using a cane for assistance and ambulation and occasionally taking over-the-counter pain medication. Upon examination, Plaintiff demonstrated a maximum of thirty degree cervical-spine rotation to the left and to the right, a maximum of ten to fifteen degree cervical extension, and no more than five degrees of cervical-spine flexion. (T.p.322). Dr. Land noted mild tenderness to palpation over Plaintiff's thoracic spine and more tenderness to palpation over the lower lumbar spine. (*Id.*). Plaintiff had no difficulty picking up a flat object from a lower surface with both hands. (*Id.*). Plaintiff showed "a slow cadence gait pattern that was mildly broad based." (*Id.*). He was able to tandem walk but showed "moderate crumpling ataxia." (*Id.*). He "could bend at most 70-80 degrees anteriorly at the waist." (*Id.*). Straight leg raises up to forty-five degrees caused him pain on both sides of his lower back. (*Id.*). Plaintiff walked with no assistive devices and put on

9

his shoes and socks without assistance. (*Id.*). Dr. Land's impression was chronic back pain, possibly secondary to degenerative arthritis involving the cervical and lumbar spine, and alcohol dependency. (T.p.323). Dr. Land also noted his impression that Plaintiff's reliability and efforts during the examination were poor. (T.p.322).

On January 4, 2008, Bertron Haywood, M.D. assessed Plaintiff's physical RFC, diagnosing him primarily with chronic back pain and secondarily with osteoarthritis of the knees. (T.p.324). Dr. Haywood believed Plaintiff could lift and/or carry twenty pounds occasionally and ten pounds frequently, stand and/or walk (with normal breaks) for a total of about six hours in an eight-hour workday, sit (with normal breaks) for a total of about six hours in an eight-hour workday, and push and/or pull (including operation of hand and/or foot controls) with no limitations. (T.p.325). Dr. Haywood further opined that Plaintiff had no postural, manipulative, visual, communicative, or environmental limitations. (Tr. 326-28).

On January 10, 2008, Plaintiff underwent a magnetic resonance imaging (MRI) scan of his spine. (T.p.352). The MRI scan showed multilevel degenerative changes, most notably at C4-5 and L4-S1. (T.p.354). Imaging of Plaintiff's right knee showed "[m]ild osteoarthritic changes of the medial compartment. and asymmetric involvement of the patellofemoral compartment." (T.p.362). The reviewing physician, Dr. Terence Hamel, suspected medullary infarctions in the metaphyses of the femur and tibia. (*Id.*).

The MRI scans were sent to David Cory Adamson, M.D., Ph.D., for a neurosurgery consultation. (T.p.380). Dr. Adamson found Plaintiff's cervical and lumbar MRI scans "really unremarkable," noting only "very mild" degenerative disc disease that was "less than expected for [Plaintiff's] age." (*Id.*). The worst degeneration, according to Dr. Adamson, was "at L5S1 with a very tiny disc bulge that does not cause any significant nerve root compression." (*Id.*). Dr.

10

Adamson reported that "throughout the entire spine, there is no significant cord or nerve root compression for which I can recommend a surgical procedure." (*Id.*). Instead, Dr. Adamson recommended that Plaintiff continue taking non-steroidal anti-inflammatory medications, take muscle relaxants on an as-needed basis, use a lumbar corset during activity, and undergo physical therapy for cervical traction and back strengthening. (*Id.*).

William Farley, M.D., performed a second RFC assessment on June 5, 2008. (T.p.420). Dr. Farley opined that Plaintiff could lift and/or carry fifty pounds occasionally and twenty-five pounds frequently, stand and/or walk (with normal breaks) for a total of about six hours in an eight-hour workday, sit (with normal breaks) for a total of about six hours in an eight-hour workday, and push and/or pull (including operation of hand and/or foot controls) with no limitations. (T.p.414). Dr. Farley believed that Plaintiff could frequently stoop, kneel, crouch, crawl, and climb ramps and stairs but only occasionally balance and climb ladders, ropes, and scaffolds. (T.p.415). In addition, Plaintiff had no manipulative, visual, communicative, or environmental limitations.

Deanna Jamison, M.A., completed a comprehensive clinical psychological evaluation of Plaintiff on July 1, 2008. (T.p.421). Ms. Jamison noted that, while Plaintiff brought a cane with him to the evaluation, he "was observed walking along the sidewalk into the building without using his cane and was walking fine. His posture and gait were normal." (*Id.*). During the evaluation, Plaintiff maintained poor eye contact and appeared to be vague and evasive in providing information. (*Id.*). Plaintiff told Ms. Jamison he quit his job because it "became too hectic" and, when asked specifically what kind of problems interfered with his ability to maintain employment, responded, "I don't focus like I used to, my legs are not up to par for standing up long hours and even sitting." (*Id.*). Plaintiff said that he was taking ibuprofen, an analgesic, and a

11

muscle relaxant. (*Id.*). He also drank beer everyday "with breaks in between." (T.p.422). Plaintiff was able to cook, clean, bathe and dress himself, but he did not have a driver's license, and he sometimes needed help managing money. (*Id.*). Ms. Jamison felt Plaintiff was "vague in providing information and was evasive [in] answering only part of the questions that he wanted to answer." (*Id.*). In testing Plaintiff's immediate retention and recall, Ms. Jamison noted that he appeared to "put forth much effort in purposely missing" items when asked to repeat digits forwards and backwards. (*Id.*). In her summary, Ms. Jamison wrote that Plaintiff did not appear to be a reliable historian and was very vague in providing information. (T.p.424). Moreover, Plaintiff appeared to be purposefully missing items and paused for a long time "as if trying to figure out how to respond in a way he wanted to before answering questions." (*Id.*). Ms. Jamison indicated that Plaintiff appeared able to understand, retain, and follow instructions, and thus could likely sustain the attention level necessary to perform simple, repetitive tasks. She also believed he would be able to relate well to co-workers and supervisors and tolerate the stress and pressure normally associated with day-to-day work activities. (*Id.*).

When Plaintiff reported for physical therapy on September 25, 2008, he demonstrated no signs of distress, used no assistive device for ambulation, and walked with a normal gait pattern. (T.p.481).

Further facts are set out as necessary in evaluating Plaintiff's arguments.

### III. <u>ANALYSIS</u>

Plaintiff argues the ALJ erred as a matter of law in (1) finding that Plaintiff has the residual functional capacity to perform unskilled sedentary work; and (2) finding Plaintiff's testimony not entirely credible. The undersigned concludes there was substantial evidence to support each of the ALJ's determinations. Moreover, the ALJ properly considered all relevant evidence,

12

including the evidence favorable to Plaintiff, weighed conflicting evidence, and fully explained the factual basis for his resolutions of conflicts in the evidence. Plaintiff's arguments rely primarily on the contention that the ALJ improperly weighed the evidence. However, this Court must uphold Defendant's final decision if it is supported by substantial evidence. Although Plaintiff may disagree with the determinations made by the ALJ after weighing the relevant factors, this Court does not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Secretary. Craig, 76 F.3d at 589. Because that is what Plaintiff requests this Court do, his claims are without merit. The undersigned will nonetheless address Plaintiff's specific assignments of error.

### A. **The ALJ properly assessed Plaintiff's RFC**

Plaintiff argues the ALJ erred in finding he was capable of performing unskilled sedentary work. He notes that the job identified by the VE, brake liner courier, requires bilateral manual dexterity. Plaintiff contends this requirement is inconsistent with the ALJ's finding that Plaintiff must use a cane to ambulate within the workplace. Plaintiff further complains the ALJ erred in finding that there was a significant number of jobs in the national and regional economy that he can perform. Plaintiff asserts there was no evidence regarding the availability of the brake courier position "close to [his] home" and that the ALJ failed to take into account his ability to travel to a job. (DE-29, p.7). These arguments are without merit.

As an initial matter, it should be noted that the ALJ's RFC finding for Plaintiff is actually far more restrictive than the only medical opinions of record that assess Plaintiff's functional limitations. In particular, Dr. Haywood opined that Plaintiff could lift and/or carry twenty pounds occasionally and ten pounds frequently, stand and/or walk for a total of about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and push and/or

13

pull with no limitations, while Dr. Farley believed that Plaintiff could lift and/or carry fifty pounds occasionally and twenty-five pounds frequently. In addition, Dr. Haywood found Plaintiff had no postural, manipulative, visual, communicative, or environmental limitations, while Dr. Farley concluded that Plaintiff could frequently stoop, kneel, crouch, crawl, and climb ramps and stairs but only occasionally balance and climb ladders, ropes, and scaffolds, with no manipulative, visual, communicative, or environmental limitations. Giving Plaintiff the benefit of the doubt, however, the ALJ gave little weight to these opinions that Plaintiff could perform light to medium work because they did not give adequate consideration to Plaintiff's subjective complaints.

Further, there is no conflict or inconsistency between the findings by the ALJ that the courier position requires bilateral manual dexterity and Plaintiff's need to use a cane while ambulating at the workplace, because, as the VE clearly explained at the hearing, the courier position is "not a standing job." (T.p.35). Because Plaintiff does not have to use his cane while sitting, the requirement of bilateral manual dexterity does not prevent him from performing the courier position. The ALJ moreover did not err in finding that the brake courier position existed in significant numbers in the national and regional economy. The VE testified with regard to the brake courier position and noted there were approximately 3,259 positions available nationally and about 690 positions available regionally. (T.p.34). The Fourth Circuit has concluded that as few as 110 jobs in the region may constitute a significant number. *See* Hicks v. Califano, 600 F.2d 1048, 1051 n.2 (4th Cir. 1979). Finally, the disability regulations do not require that the identified job be close to the claimant's residence, only that the job exists in significant numbers in the national economy. *See* 20 C.F.R. § 404.1566(a)(1) (noting that "[i]t does not matter whether . . . [w]ork exists in the immediate area in which [a claimant] live[s]"). Thus, the ALJ did not err in failing to consider whether the identified courier position exists within a convenient distance to

14

Plaintiff's residence.   Plaintiff's assignment of error is therefore overruled.

### B. The ALJ properly assessed Plaintiff's credibility

Plaintiff challenges the ALJ's determination regarding the credibility of his testimony. The ALJ found that while Plaintiff's "medically determinable impairments could be reasonably be expected to cause the alleged symptoms," Plaintiff's statements "concerning the intensity, persistence and limiting effects of these symptoms [were] not credible to the extent they [were] inconsistent" with the RFC assessment.   As the ALJ explained,

> [t]he claimant's testimony about the effect of his impairments on his functional abilities is not fully credible.  His MRIs generally show moderate degeneration in the spine with basic treatment with non-narcotic medications and injections and no recommendations for surgical therapy.   There is no evidence in the record to support the claimant's allegations about his inability to stand for only ten minutes at a time or for not being able to sit for prolonged periods.   In addition, the claimant's alleged pain level of eight out of ten is not consistent with his course of medical treatment or current medical regimen, which currently consists of Naproxen for pain and generic Flexeril for muscle spasm (Exhibits 12F, 12E).
> Giving the claimant the benefit of the doubt, the undersigned has outlined a residual functional capacity for the claimant that accounts for the pain in his neck, back, and knees.   He can perform a significant range of sedentary work.   Due to some pain and the effects of medicine he is limited to performing unskilled work only.   Because of knee osteoarthritis he must always use a cane to walk within the workplace.   This is a reasonable residual functional capacity given the objective evidence in the record (Exhibit 12E).

(T.p.18).

Plaintiff argues he provided credible testimony consistent with the medical record showing a "long history of neck and back pain" and "multi-level degenerative changes throughout the entire spine."   (DE-29, p.10).   However, neither of these factors-the history of Plaintiff's condition nor its extent-is dispositive to the issue of disability.   Rather, the ALJ must consider the degree to which these symptoms limit Plaintiff's ability to perform substantial gainful activity.  *See* 20 C.F.R. 404.1520(f); Mastro, 270 F.3d at 177 (the ALJ must consider whether the severity of the

15

impairment precludes claimant's ability to engage in substantial gainful employment). The ALJ's detailed findings of fact demonstrate that the ALJ gave proper weight to all of Plaintiff's limitations and impairments in assessing Plaintiff's credibility. Likewise, the ALJ's citations to Plaintiff's medical records constitute substantial evidence supporting his assessment.

In evaluating a claimant's credibility, an ALJ considers, in addition to the objective medical evidence, the following factors: (1) daily activities; (2) the location, duration, frequency, and intensity of pain; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of medication; (5) treatment other than medication; (6) other measures used to relieve pain or other symptoms; and (7) other factors. *See* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

Here, the objective medical evidence of record is not consistent with Plaintiff's statements about his pain and limitations. Plaintiff testified that, on the one-to-ten scale, his day-to-day pain was about an eight with his medications and a nine without them, and that his lowest pain level, which he experienced only about once per month, was about a five. (T.pp.32–33). Because of his pain, he asserted that he could stand, with or without his cane, for only fifteen minutes before needing to sit down and rest; sit for about fifteen to twenty minutes before having to change positions; walk for about fifteen to twenty minutes before having to stop and rest; and not bend, stoop, or squat because it was "just too hard." However, the ALJ properly found those statements to be less than credible because, among other reasons, Plaintiff's "MRIs generally show moderate degeneration in the spine with basic treatment with non-narcotic medications and injections and no recommendation for surgical therapy." (T.p.17).

The conservative treatment prescribed for Plaintiff's pain undercuts the credibility of his allegations. "[W]hen considered with other information, the routine nature of a course of

16

treatment may indicate that a condition is not as severe as a plaintiff's subjective complaints may otherwise indicate." Viverette v. Astrue, No. 5:07-CV-395-FL, 2008 U.S. Dist. LEXIS 95538, at *6-7 (E.D.N.C. Nov. 24, 2008). For example, on February 11, 2004, Plaintiff indicated that, overall, he had been feeling well and his back and knee pain had, for the most part, been well treated with Motrin. Plaintiff told Dr. Land that he was only occasionally taking over-the-counter medications and told Dr. Perez-Montes that his allegedly nine-level back and neck pain could be relieved by rest, by itself, or with ibuprofen. Similarly, Plaintiff told Ms. Jamison that he was taking only ibuprofen, an analgesic, and a muscle relaxant. Dr. Adamson recommended that Plaintiff continue taking only non-steroidal anti-inflammatory medications, take muscle relaxants on an as-needed basis, use a lumbar corset during activity, and do physical therapy for cervical traction and back strengthening. Plaintiff's favorable responses to conservative treatment, when considered in conjunction with his medical evaluations, suggest that Plaintiff's subjective reports of pain may be exaggerated.

Finally, specific accounts from professionals who evaluated him suggest that Plaintiff's statements are not entirely credible. Dr. Land stated that Plaintiff's reliability and efforts during the examination were poor. Ms. Jamison noted that, while Plaintiff brought a cane with him to the evaluation, he was observed walking with normal gait and posture without using his cane before entering the building. During the evaluation, Plaintiff maintained poor eye contact and appeared to be vague and evasive in providing information. A physical therapist noted on September 25, 2008, that Plaintiff demonstrated no signs of distress, used no assistive device for ambulation, and walked with a normal gait pattern. The ALJ reasoned that the lack of consistency between these observations, on one hand, and Plaintiff's testimony that he required a cane to walk for the past few years, on the other, diminished his credibility. Thus, the ALJ properly found that Plaintiff's

17

statements concerning his pain and limitations were not entirely credible because his MRI scans showed only moderate degeneration of the spine, his allegations of pain were not supported by the medical evidence of record, he was prescribed and responded well to conservative treatment, and various medical professionals expressly commented on his lack of credibility.  Accordingly, this assignment of error lacks merit.

## IV.  CONCLUSION

For the reasons discussed above, it is RECOMMENDED that Plaintiff's motion for judgment on the pleadings (DE-28) be DENIED, that Defendant's motion for judgment on the pleadings (DE-31) be GRANTED, and that the final decision by Defendant be AFFIRMED.

SO RECOMMENDED in Chambers at Raleigh, North Carolina on Thursday, October 13, 2011.

_____
WILLIAM A. WEBB
UNITED STATES MAGISTRATE JUDGE